IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EUGENE WILBORN,

                    Plaintiff,                            OPINION & ORDER

    v.

                                                13-cv-661-jdp

KRAFT FOODS GROUP, INC.,

                    Defendant.

---

Plaintiff Eugene Wilborn worked for defendant Kraft Foods Group, Inc. After Wilborn was involved in a workplace accident, Kraft asked him to submit to a drug test, pursuant to its substance abuse policy. Wilborn agreed, and, also pursuant to Kraft policy, he was suspended pending the results. But the first test did not work—through no fault of Wilborn—and Kraft asked him to submit to a second test. Wilborn objected to being retested, with the support of his union, but ultimately Kraft fired him for failure to comply with Kraft's substance abuse policy.

Wilborn brought suit in this court under 42 U.S.C. § 1981, alleging that Kraft discriminated against him on the basis of his race and retaliated against him for opposing the second drug test. Kraft has moved for summary judgment on both claims. Dkt. 20. Wilborn has failed to state a prima facie case of discrimination or to show that Kraft's reasons for testing and terminating him were pretextual. Wilborn has also failed to present evidence that his opposition to Kraft's testing caused his termination. Kraft is therefore entitled to summary judgment on both of Wilborn's claims.

## UNDISPUTED FACTS

The court finds that the following facts are material and, except where noted, undisputed. Unless otherwise indicated, the events in question occurred in 2011.

Kraft operates a facility in Madison, Wisconsin, where it produces Oscar Mayer food products. Wilborn began working at Kraft's Madison facility in 2000. He started as a laborer and went on to hold several different positions during his time with the company. In 2011, he worked in the sanitation department, during the overnight shift, and his duties included cleaning three machines and the areas around them.

While employed with Kraft, Wilborn was a member of the United Food & Commercial Workers, Local 538 (the union), which has a collective bargaining agreement with Kraft. The agreement contains a Substance Abuse Policy that provides for drug testing of union members under certain circumstances. Testing for drugs, controlled substances, and alcohol is required after any accident involving vehicles or powered equipment and any accident causing more than $500 of damage to Kraft's property or injury to another employee. Kraft has discretion to select the appropriate method of testing (*i.e.*, urine, blood, saliva, hair follicle, etc.). The policy also states that refusal to submit to a required test will result in disciplinary action, up to and including termination, even for a first offense. Although the policy does not explicitly identify the circumstances under which Kraft can suspend an employee pending the results of a test, it does state that "[i]n the event an employee is suspended pending results of a drug/alcohol test, and the results are negative, the employee will receive pay for time off provided the incident which triggered the test does not warrant disciplinary time off." Dkt. 36, at 5.

On January 12, 2011, Wilborn was involved in a workplace accident. He had finished cleaning his assigned machine and decided to help a co-worker who was scrubbing a nearby floor. Wilborn used a battery-powered pallet jack to move a container of unused scrap meat and clear a section of the floor for cleaning. But the pallet jack slid on the already soapy floor and collided with one of the nearby machines. The co-worker had left a door on the machine open, and when the pallet jack hit the machine, it knocked the door off one of its hinges. Wilborn

2

finished cleaning up and then went to let his supervisor know about the accident. After two supervisors inspected the damage, they informed Wilborn that he would need to go to the personnel department to discuss the incident.

The same day, Wilborn met with Tim Emond, an Associate Human Resources Manager. Several others were present at the meeting, including Trent Schwenn, the Chief Union Steward. After Wilborn explained what had happened, Emond told him that it would cost approximately $5,000 to replace the door and that Wilborn would have to submit to a drug test. During the meeting, Schwenn disputed that a $5,000 replacement was necessary, but by that time, Emond had input from a maintenance supervisor and a mechanic, both of whom opined that the damage could not be repaired. Despite Schwenn's disagreement with Emond, Wilborn was willing to take a drug test and agreed to do so after the meeting. Schwenn and two of Wilborn's supervisors accompanied him to a nurse's station after finishing the meeting. Wilborn signed an authorization for the drug test, acknowledging that he was involved in a collision that caused approximately $5,905.96 in damage. Wilborn gave both a hair and a urine sample. Because he shaves his head, Wilborn had to give hair samples from his armpits and his beard.

After the test, Wilborn cleaned out his locker and was escorted off Kraft's property. The company did not permit Wilborn to return to work pending the results of the test, citing Wilborn's disciplinary history and Kraft's concern that he might act aggressively toward or attempt to intimidate the supervisors and co-workers who inspected the damaged machine.[1] Since 2000, Wilborn had had seven different disciplinary actions, many for aggressive conduct, and some resulting in termination followed by reinstatement. These incidents include entering

---

[1] Wilborn attempts to dispute this fact by arguing that "it is a legal question whether Kraft suspended Wilborn because of his prior disciplinary history or his race." Dkt. 28, at 12. But the question of what reasons Kraft gave for suspending him is a factual one, and Wilborn has not identified evidence in the record to contradict that these are the reasons Kraft offered.

other departments within Kraft's facility to get into confrontations with other employees, leaving before the end of his shift without a supervisor's permission, workplace harassment, insubordination, and verbal altercations with supervisors.

On January 17, before Kraft had received the results of the first drug test, Wilborn filed a grievance with the Human Resources Department. He claimed that Kraft lacked cause to test him for drugs because the door to the machine he damaged was still being worked on and Kraft therefore lacked proof of how much damage Wilborn actually caused. Wilborn further claimed that Kraft was acting inconsistently with its substance abuse policy in suspending him pending the results of the drug test. Wilborn's grievance did not, however, allege that Kraft's actions were motivated by his race or were otherwise discriminatory. Two months later, Kraft denied the grievance on the grounds that Wilborn had been involved in a vehicle accident and had caused more than $500 in damage to company property. Kraft also explained that Wilborn had been suspended pending the results "because of prior work history." Dkt. 23-3, at 2.

Wilborn's test results came back from Kraft's third-party testing company, Verifications, Inc., on January 18. Verifications cancelled the urine test because the specimen did not contain the name and signature of the person who collected it, and the testing company rejected the hair follicle test because Wilborn had submitted an insufficient quantity of hair on which to perform testing. Verifications recommended that Kraft acquire a new hair sample, and Kraft's human resources department decided to ask Wilborn for a second hair follicle test.

The next 24 hours saw a flurry of discussion about the retest, most of it between Wilborn, Emond, Schwenn, and Joe Jerzewski, the union's president. Susan Frueh, the human resources manager in Kraft's Madison office, was also involved in most of the correspondence. First, Schwenn and Jerzewski met with Emond. The union representatives renewed their argument that they did not believe the damaged door had needed to be replaced. When Emond

4

explained that Wilborn would need to be retested because of the rejected hair follicle test, the union representatives immediately said that they would challenge the retest. They left the office before Emond could inform them that if Wilborn refused, he would be fired. Next, Jerzewski went to Frueh's office and had a similar conversation. Frueh informed him that Wilborn would be fired if he refused, and she explained that the human resources department was not willing to alter its position. Finally, Jerzewski and Emond both called Wilborn, separately, and informed him that he would need to retake the drug test.

Wilborn was in Indiana when he and Emond spoke over the phone on January 19. Emond agreed to locate a testing location in Indiana, and told Wilborn that he had two weeks to complete the retest. Wilborn was willing to retest, but doubted that he could grow sufficient hair in two weeks.[2] Emond informed Wilborn that he would be terminated if he failed to complete the retest within two weeks.

Wilborn returned home to Wisconsin a few days after talking to Emond. Wilborn met with his union representative to discuss alternative testing methods because he could not grow hair on his head fast enough to complete the retest. It is unclear how earnestly Wilborn tried to grow hair though; apparently he shaved his head a few times between January 19 and March 15. Dkt. 22 (Wilborn Dep. 95:11-96:6). Shortly after Wilborn's meeting with his union representative, legal counsel for the union got involved—the same attorneys who now represent Wilborn in this case. In a January 21 letter to Kraft, counsel opined that "any further attempts to request additional drug testing constitutes harassment and unequal treatment under both the

---

[2] The parties dispute whether, during the call, Emond told Wilborn that he had to grow hair on his head to submit for the retest; Wilborn states that he did, Dkt. 22 (Wilborn Dep. 79:11-82:16), Emond states that he did not, Dkt. 24, ¶ 46. This dispute is immaterial because even accepting Wilborn's version of the events, in which he was required to submit head hair for the retest, the outcome of Kraft's motion is the same.

Collective Bargaining Agreement . . . and federal law (42 U.S.C. § 2000)." Dkt. 23-7, at 2. Wilborn reviewed this letter with his union representative before the attorneys sent it to Kraft.

Wilborn's two weeks came and went, and he did not retest. Frueh extended the deadline, giving Wilborn until February 7 to complete his second test. She again warned that if Wilborn failed to comply, Kraft would terminate his employment. A union representative forwarded Frueh's correspondence to Wilborn. But Wilborn did not submit to a retest, and so Kraft fired him on March 14. In its termination letter, Kraft explained that Wilborn was being terminated for refusing to submit to a drug test when requested to do so.

By April, the grievance Wilborn filed to protest his initial test and suspension had advanced through the collective bargaining agreement's dispute resolution process. Wilborn and his union representative met with Frueh and other Kraft management personnel to discuss whether to reinstate Wilborn. To prepare for the meeting, Frueh sought out information about alternative drug testing methods from Verifications. Specifically, Frueh asked about what types of tests, if any, could provide similar results and how far back these tests could detect the presence of drugs and alcohol. Verifications responded that Kraft's contract only provided for breath, urine, and hair testing, and that adding other methods would require time and administrative approval. Verifications further explained that hair testing was the best method because saliva and blood would become diluted after time and because urine would only capture drugs used in the three days prior to testing. Kraft decided against adding any new types of tests to its testing procedures. Despite Wilborn's willingness to submit to different testing methods, Kraft continued to insist on a hair follicle test.

After the grievance meeting, Kraft prepared a response memo. The memo confirmed that Wilborn

> was involved in a powered industrial vehicle accident which resulted in property damage. In accordance with Kraft's Substance Abuse Policy, [Wilborn] provided a hair sample for a drug screen, but the sample was not sufficient. [Wilborn] was requested to provide a 2nd sample, and was given almost 2 months to grow enough hair for this test. [Wilborn] refused to provide this sample.

Dkt. 23-11, at 2. Kraft concluded by stating that if Wilborn agreed to provide a hair sample, he could return to work under a "Condition of Employment."[3] A week after receiving Kraft's response and the offer of reinstatement, Wilborn's union representative rejected the offer. More discussion followed, and the company eventually renewed its offer of reinstatement and gave Wilborn another month in which to retake his drug test. Neither Wilborn nor the union ever responded to the extended deadline.

Communication broke down and the next documented correspondence was not until August, when the union's Secretary-Treasurer asked Frueh about the status of Wilborn's grievance. Frueh answered that Kraft had never heard back on its most recent offer. After some discussion, Kraft once again extended Wilborn's deadline, offering to reinstate him under a Condition of Employment if he completed a drug test and the results were negative. Wilborn rejected the renewed offer. At his deposition, Wilborn testified that he had no objection to submitting to another drug test. Dkt. 22 (Wilborn Dep. 130:20-132:16). Instead, he rejected the offer because he did not want to return to work under a Condition of Employment. Under such a condition, he could be fired for any violation of Kraft's rules and regulations, including coming in late to work.

Jerzewski contacted Kraft about its most recent offer of reinstatement, and asked whether the union could arbitrate for Wilborn to receive back pay if he accepted the offer.

---

[3] Kraft uses such Condition of Employment agreements as "last chance" agreements between Kraft, the union, and the terminated employee. The written agreements identify the terms by which an employee will be reinstated and explain that any violation will result in discharge.

Jerzewski also explained that Wilborn would not agree to a Condition of Employment that permitted Kraft to terminate him for any violation of company rules. Frueh answered that Kraft would not agree to arbitrate for back pay but would consider offering some limited back pay. Frueh refused to change the language of the Condition of Employment. The conversation led Kraft to send Wilborn one last offer of reinstatement under a Condition of Employment. Wilborn discussed the offer with his union representatives, and he rejected it.

A few months later, Wilborn had a change of heart. Toward the end of 2011 or the beginning of 2012, he contacted the union and expressed a willingness to return to Kraft, even if it meant accepting a Condition of Employment. When the union contacted Kraft, however, the company explained that it was no longer interested in reinstating Wilborn.

Unable to resolve his dispute informally or administratively, Wilborn filed a complaint in this court under 42 U.S.C. § 1981. His second amended complaint, Dkt. 15, alleges that Kraft discriminated against him by not permitting him to work pending the results of the initial drug test and by terminating him for refusing to retake the drug test. The complaint further alleges that Kraft retaliated against Wilborn for the letter his attorneys sent to Kraft regarding the second test. The court has subject matter jurisdiction under 28 U.S.C. § 1331 because his claim arises under federal law.

ANALYSIS

Kraft has moved for summary judgment on both Wilborn's discrimination claim and his retaliation claim. As to the discrimination claim, Kraft contends that Wilborn cannot prove his claim under the indirect method because he cannot make out a prima facie case or show pretext. And he cannot prove his discrimination claim under the direct method because he lacks circumstantial evidence of discriminatory intent. As to the retaliation claim, Kraft contends that it fails as a matter of law because Wilborn lacks evidence of a causal connection between his

protected conduct and a retaliatory employment action. Wilborn counters that there are genuine disputes of fact sufficient to survive summary judgment. Wilborn fails to adduce admissible evidence sufficient to raise a genuine dispute of material fact, and Kraft is entitled to summary judgment on both of Wilborn's claims.

Summary judgment is appropriate if the moving party, here Kraft, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court construes all facts and makes all reasonable inferences in Wilborn's favor, but as the non-moving party who will ultimately bear the burden of persuasion, he must "go beyond the pleadings and affirmatively demonstrate a genuine issue of material fact for trial." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996). Wilborn cannot avoid summary judgment on his claims if he "fails to demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [his] favor." *Id.*

## A.  The Schwenn declaration

The court begins with a fundamental evidentiary issue. Wilborn's opposition to Kraft's motion for summary judgment relies heavily on the declaration of Trent Schwenn, Wilborn's union steward. Wilborn cites Schwenn's declaration to support more than half of his proposed findings of fact, Dkt. 29, and Wilborn relies nearly exclusively on the declaration to dispute Kraft's proposed facts. Dkt. 28. Unfortunately for Wilborn, in critical respects—mostly concerning the preferential treatment accorded to white employees—Schwenn's declaration lacks foundation and is merely conclusory. Wilborn cannot successfully oppose summary judgment without adducing admissible evidence that sets forth specific facts showing that there

9

is a genuine issue for trial. Schwenn's declaration does not provide the evidentiary support Wilborn needs.

The first problem is foundation. Under Rule 602 of the Federal Rules of Evidence and Rule 56(c)(4) of the Federal Rules of Civil Procedure, Schwenn may provide evidence only about matters of which he has first-hand, personal knowledge. Schwenn states that he has served as the union's chief steward for the Madison plant since 2009, and that, in this capacity, he has been involved in all grievances and disputes arising under the labor agreement since 2009. Dkt. 31, ¶ 2. But Schwenn does not explain the nature of his involvement with these grievances. He may have been involved in a way that did not give him direct, personal knowledge of the facts. He also attests to facts going back to 2005, but he provides no basis for his knowledge prior to 2009, when he became chief steward. Schwenn's declaration establishes a foundation for his testimony about Wilborn's grievances because Schwenn was directly involved and he describes how he was involved. But Schwenn's declaration does not establish a foundation for his testimony about Kraft's policies or actions before 2005. Thus, for example, he lacks foundation to testify that "Kraft has never before asked a white employee covered by the labor agreement to be retested for hair." *Id.* ¶ 15. More important, the declaration does not establish Schwenn's personal knowledge of the treatment of unnamed white employees of which Schwenn claims to be somehow aware.

This leads to the second problem with Schwenn's declaration: he makes conclusory assertions about the preferential treatment of white employees without providing specific facts. These are the two critical statements concerning the preferential treatment of white employees:

> 12.    I am aware of white employees who were drug tested and permitted to continue to work while awaiting the test results who had histories of discipline for similar types of incidents.

10

. . .

> 16.     I am aware of white employees covered by the labor
> agreement who have had accidents causing more than $500 in
> property damage who were not drug tested.

*Id.* To prove his discrimination case under the indirect method, Wilborn must adduce evidence of comparators—other employees who are not members of a protected class, but are otherwise comparable—who did not receive the adverse treatment Wilborn did. These paragraphs from Schwenn's declaration are, in essence, a bare recital of the element that Wilborn must prove, without factual elaboration.

Schwenn does not identify the white employees, nor does he provide the facts underlying any of the incidents to which he alludes. In the absence of factual elaboration, Wilborn has not shown that there is a genuine dispute of fact requiring trial. For example, Schwenn does not assert that any white employee had as many disciplinary infractions as Wilborn, only that some had histories of discipline for similar types of incidents. The court cannot, on the basis of this presentation, conclude that the unnamed white employees are appropriate comparators.

The lack of factual elaboration is also grossly unfair to Kraft, who cannot effectively respond to such vague allegations concerning unnamed white employees. Wilborn proposes a fact in which he names five employees, citing to paragraph 16 of Schwenn's declaration. Dkt. 29, ¶ 10. But the identification of these employees is utterly without evidentiary support because Schwenn's declaration does not mention them. The court will not accept proposed facts without evidentiary support. But even if the court accepted Wilborn's unsupported identification of the five employees, Kraft has responded with evidence showing that these five employees did in fact submit to drug testing. Dkt. 33, ¶ 10 and Dkt. 35. Wilborn cannot evade

Kraft's documented refutation of his evidence with a vague declaration that does not provide any specific details or cite any documentary evidence.

A declaration in opposition to a motion for summary judgment must set forth specific facts, not mere conclusions. *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 894 (7th Cir. 2003). The point of the evidentiary requirements in Rule 56 is to require the non-moving party to go beyond the conclusory allegations of the complaint, not simply recast those conclusory allegations in the form of a declaration. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). The court recognizes that there is a spectrum of factual specificity, from complete factual detail on one end, to the bare quotation of the legal elements of the claim on the other. Schwenn's declaration provides less factual elaboration than those held to be conclusory in *Thomas*. Schwenn's declaration clearly falls on the conclusory end of the spectrum because it simply takes the adverse actions that befell Wilborn and asserts that unnamed white employees in the same circumstances did not suffer the same fate. Without factual elaboration, Schwenn's statements about the white comparators are nothing more than mere conclusions, inadequate to create a genuine dispute of fact. As shown below, the lack of evidentiary support will be fatal to Wilborn's claims.

**B.  Wilborn's race discrimination claim**

Wilborn brings his race discrimination claim under § 1981, and "although section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009). "An employee alleging racial discrimination under Title VII or § 1981 may proceed via the direct or the indirect method of proof." *Harris v. Warrick Cnty. Sheriff's Dep't*, 666 F.3d 444, 447 (7th Cir. 2012). Under the "direct method," Wilborn can "avoid summary judgment

by presenting sufficient evidence, either direct or circumstantial, that [Kraft's] discriminatory animus motivated an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). Under the "indirect method," Wilborn must follow the Supreme Court's familiar burden-shifting framework: (1) Wilborn must state a prima facie case of discrimination; if he does, then (2) Kraft must proffer a legitimate, non-discriminatory reason for its decision; if it does, then (3) Wilborn must identify evidence showing that Kraft's stated reason is a pretext for discrimination. *Id.* Wilborn contends that he can pursue his race discrimination claim under both the indirect and direct methods.

### 1. The indirect method

Wilborn cannot proceed under the indirect method because he fails to make out a prima facie case of race discrimination. To establish a prima facie case, Wilborn must "provide evidence that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) other similarly-situated . . . employees were treated more favorably." *Huang v. Cont'l Cas. Co.*, 754 F.3d 447, 450 (7th Cir. 2014). Wilborn's failure to establish any single element, even if he can prove the rest, is enough to support summary judgment in Kraft's favor. *Traylor v. Brown*, 295 F.3d 783, 790 (7th Cir. 2002). Kraft concedes that Wilborn satisfies the first element because he is an African-American. Dkt. 25, at 3 n.2. But the company contends that Wilborn has failed to identify evidence of the remaining elements.

In this case, Kraft made four distinct decisions that make up what Wilborn now claims to be discriminatory treatment: (1) requiring Wilborn to undergo a drug test after the January 12 accident; (2) suspending Wilborn pending the results of the initial drug test; (3) requiring Wilborn to undergo a second drug test after the first test's results were cancelled; and

(4) terminating Wilborn for refusing to take the second drug test. *See generally* Dkt. 15, ¶¶ 24-29 and Dkt. 27, at 7-10. Kraft contends that with the exception of Wilborn's suspension and his termination, none of the events constituted adverse employment actions. Kraft further asserts that Wilborn cannot use these events to make out a prima facie case because he was not meeting Kraft's legitimate expectations when any of them occurred. Finally, Kraft observes that Wilborn has not identified similarly situated employees who received more favorable treatment.

### a.   Adverse employment actions

Of the four events upon which Wilborn bases his discrimination claim, only three qualify as adverse employment actions: suspension, retest, and termination. In the Seventh Circuit, "an adverse action must materially alter the terms or conditions of employment to be actionable under the antidiscrimination provision of Title VII. . . . This means that the action must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Porter v. City of Chi.*, 700 F.3d 944, 954 (7th Cir. 2012) (internal citations and quotation marks omitted). As relevant in this case, a drug test does not rise to the level of an adverse employment action unless the "test is not performed in a routine fashion following the regular and legitimate practices of the employer, but is conducted in a manner that harasses or humiliates employees." *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001-02 (7th Cir. 2000). Because Wilborn has failed to demonstrate that the initial drug test fits within this definition, he cannot use the event to build his prima facie case.

Wilborn does not dispute that the collective bargaining agreement that was in effect while he was employed contained a substance abuse policy, or that the policy permitted Kraft to test any employee who was involved in an accident with a powered piece of equipment or who caused more than $500 of damage to Kraft's property. Wilborn's accident qualified under both

provisions, and Kraft's decision to require a drug test was a straightforward application of its policy. *See id.* at 1002 ("[A] reasonable and legitimate request made pursuant to [a] published Drug Policy does not constitute the type of adverse employment action that Title VII is designed to prevent."). Wilborn has not indicated that he felt harassed or humiliated by the first test. Indeed, during his deposition, Wilborn testified that he "was okay with taking [the initial test]," and that it was his union representative who objected on the basis that Kraft had not suffered more than $500 in damage. Dkt. 22 (Wilborn Dep. 55:3-10).[4] Wilborn cannot sustain his burden of demonstrating that the initial drug test was an adverse employment action.

Of the three remaining employment actions, Kraft concedes that Wilborn's termination qualifies as an adverse employment action and admits that the unpaid suspension pending the results of the first test "could [also] be considered an adverse employment action." Dkt. 25, at 6 n.2. Kraft contends, however, that requiring Wilborn to retest did not amount to an adverse employment action. The argument has traction and Wilborn does not counter it. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("The definition of an adverse employment action is generous, but it is still subject to certain limitations. . . . At the very least, [a plaintiff] must show some quantitative or qualitative change in the terms or conditions of his employment that is more than a mere subjective preference."). But demanding additional tests and extending an employee's suspension could conceivably rise to the level of an adverse action. Thus, because the burden to present a prima facie case is not onerous and because Wilborn

---

[4] Wilborn's only additional argument on this point is that the initial drug test qualifies as an adverse employment action because at least five white employees had accidents involving more than $500 in damage, but were not tested. Dkt. 27, at 7. To support his contention, however, Wilborn relies exclusively on Schwenn's affidavit, which is too conclusory to support the assertion. *See Keys v. Foamex, L.P.*, 264 F. App'x 507, 511 (7th Cir. 2008) (rejecting "the conclusory assertion that because the test was (allegedly) governed by a discriminatory motive it was necessarily harassing and humiliating").

receives the benefit of the doubt at this stage of the case, the court will permit him to proceed with three adverse employment actions upon which to base his prima facie: (1) his suspension pending the results of the first test; (2) the requirement that he retest; and (3) his termination.

### b.  Legitimate expectations

According to Kraft, Wilborn could not possibly have been meeting its legitimate expectations when he lost control of the pallet and caused damage to Kraft's property, nor could Wilborn have been meeting its legitimate expectations when he refused to retest despite Kraft's insistence that he do so. The company therefore contends that Wilborn cannot satisfy the second element of his prima facie case. Kraft cites decisions from other district courts in this circuit for the proposition that employees who cause preventable workplace accidents are, by definition, not meeting their employers' legitimate expectations. Dkt. 25, at 4 (citing *Tolbert v. Con-Way Transp. Servs., Inc.*, No. 04-cv-0082, 2005 WL 1476298, at *5 (S.D. Ind. June 15, 2005); *Sims v. Fort Wayne Cmty. Sch. (FWCS)*, No. 03-cv-430, 2005 WL 3801461, at *18 (N.D. Ind. Feb. 2, 2005)). The argument would have merit, except for the fact that Kraft did not suspend or fire Wilborn for getting into an accident; the company suspended him because of his disciplinary history and fired him for refusing to take a second drug test after his initial test was cancelled. Dkt. 23-9, at 2.

Wilborn correctly observes that he did exactly what Kraft asked him to with regard to the first drug test (and the associated suspension). He reported the accident, met with the human resources department, and submitted to a drug test. With regard to his refusal to retest, Wilborn argues that Kraft's reasons for requiring the second drug screen were a pretext for discrimination and, therefore, that his refusal to retest does not prevent him from establishing a prima facie case of discrimination. *See Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 745 (7th Cir.

16

2002) ("[A]n individual who meets the other criteria for a prima facie case and also demonstrates that the employer's legitimate expectations were themselves pretextual can survive the first prong of *McDonnell Douglas*."). For the purposes of evaluating Wilborn's prima facie case, the court will assume that Wilborn can make this showing. But this is a dubious assumption because, as discussed below, Wilborn fails to identify evidence of pretext in any of Kraft's decisions.

### c.  Similarly situated employees

Benefitting from an appropriately generous view of the evidence, Wilborn has demonstrated that he is a member of a protected class who suffered three adverse employment actions while meeting his employer's legitimate expectations. For the fourth and final element of Wilborn's prima facie case, he must show that Kraft treated similarly situated employees outside of his protected class more favorably. Wilborn cannot make such a showing and therefore fails to state a prima facie case of race discrimination.

The court uses "a flexible, commonsense inquiry" when evaluating potential comparators under the fourth element of the *McDonnell Douglass* framework. *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007). The goal of the inquiry "is to determine whether there are enough common factors between a plaintiff and a comparator—and few enough confounding ones—to allow for a meaningful comparison in order to divine whether discrimination was at play." *Id.* It is Wilborn's burden to identify similarly situated employees. *Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002) ("To meet his burden of demonstrating that another employee is 'similarly situated,' *a plaintiff* must demonstrate that there is someone who is directly comparable to him in all material respects.") (emphasis added). But he has not identified *any*

comparators, let alone individuals who would allow for a meaningful comparison. Instead, he has merely alluded to viable comparators.

Wilborn relies on Schwenn's declaration to support his assertion that white employees with similar disciplinary histories were not suspended pending the results of their first drug tests. The declaration does not identify a single comparator, *see* Dkt. 31, and the court has already declined to accept the declaration on this point because "uncorroborated generalities are insufficient to support a Title VII claim." *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 615 (7th Cir. 2001). Schwenn's conclusory assertion that there are similarly situated employees, and Wilborn's equally conclusory regurgitation of the assertion is insufficient evidence at this point in the case. *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010) ("[M]ere conclusory allegations do not constitute evidence."); *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir. 1998) (a plaintiff's conclusory allegations about similarly situated individuals were insufficient to avoid summary judgment). Wilborn has failed to identify evidence of similarly situated employees who received better treatment than he did, and so cannot make a prima facie showing of discrimination.

### d.  Pretext

Wilborn's inability to make out a prima facie case of discrimination entitles Kraft to summary judgment. Yet, even if Wilborn had cleared that hurdle, he still would not be able to proceed under the indirect method. Kraft has articulated legitimate, non-discriminatory reasons for each action it took leading up to, and including, Wilborn's termination. Specifically, Kraft explains that it followed its substance abuse policy in requiring Wilborn to submit to a drug test and insisting that he successfully complete a retest when the initial test was cancelled. Kraft also explains that it suspended him because of concerns that he might act aggressively toward the

18

supervisors and co-workers who were involved in investigating the January 12 accident. Finally, Kraft asserts that, consistent with its substance abuse policy, it terminated Wilborn for refusing to take a drug test. In response, Wilborn has failed to identify evidence from which a reasonable jury could conclude that Kraft's reasons are merely a pretext for discrimination.

In the context of employment discrimination claims, "[p]retext means a dishonest explanation, a lie rather than an oddity or an error." *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006). It is not enough for Wilborn to show that Kraft's reasons for the disciplinary actions it took against him were "mistaken, ill considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005) (internal citations omitted). Instead, Wilborn must identify evidence that Kraft's reasons: "(1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) [were] insufficient to motivate the adverse employment action." *Davis v. Wis. Dep't of Corr.*, 445 F.3d 971, 977 (7th Cir. 2006) (internal citations omitted). Wilborn has failed to identify any evidence of pretext in Kraft's decision making in this case.

There is no record evidence of pretext in Kraft's decision to suspend Wilborn pending the results of the initial test. In responding to Wilborn's grievance, Kraft stated that he was suspended "because of prior work history." Dkt. 23-3, at 2. During her deposition, Frueh explained her concern that Wilborn would have intimidated other Kraft employees investigating the accident or that he would have acted aggressively toward supervisors and maintenance technicians already involved. Dkt. 32 (Frueh Dep. 29:13-33:21). Wilborn cannot establish pretext in this rationale because he cannot point to any evidence that Frueh did not honestly believe her reasons for suspending him. He asserts that since 2005, Kraft has allowed all employees to continue working while they await their test results, and that similarly situated

19

white employees who were drug tested after accidents were allowed to continue working. Dkt. 27, at 9-10. As before, Wilborn relies exclusively on Schwenn's affidavit to support these statements. The declaration lacks foundation insofar as it purports to cover any time before 2009, and it is simply conclusory with regard to the unnamed white employees. Wilborn does not dispute that Kraft has accurately recited his disciplinary history, which includes incidents of aggression and confrontation with supervisors and co-workers. Wilborn entirely lacks admissible evidence to dispute the documentation and deposition testimony Kraft has adduced. Wilborn has not raised a genuine dispute of fact as to whether Kraft honestly believed the reasons it gave for suspending him.

Wilborn next contends that Kraft's reasons for requiring a second test, and for ultimately firing him when he refused to comply, are pretextual because they have no basis in fact. Wilborn offers two observations to support his position. First, he correctly asserts that the substance abuse policy does not discuss retesting. *See* Dkt. 23-1. But the absence of any express authorization for retesting certainly does not automatically mean that Frueh had no basis from which to conclude that she could order a second test. Whether Frueh reached the correct interpretation of an ambiguous policy is not an appropriate inquiry at this stage because this court does "not sit as a super-personnel department with authority to review an employer's business decision." *Ballance*, 424 F.3d at 621. Beyond Wilborn's claim that he was the first employee to be retested—another unsupported assertion from Schwenn's declaration—he does not identify evidence disputing that Frueh honestly believed in her authority to ask for a retest.

Wilborn's real challenge to Frueh's decision is that it amounted to "an order to do what she knew or should have known was humanly impossible." Dkt. 27, at 8. Wilborn asserts that Emond gave him two weeks in which to grow sufficient hair for a retest. According to Wilborn, however, it would have taken him at least three months to grow sufficient hair for a retest.

20

Because Kraft only gave him two weeks, Wilborn contends that the retest was a pretext for discrimination. There are several problems with this argument. The only evidentiary support for it faces authenticity issues and problems with foundation. It is a "Frequently Asked Questions" (FAQ) document that Wilborn's attorney pulled from the internet. Dkt. 30-1. The FAQ was created by Quest Diagnostics, a drug testing company. But Kraft never used the company for its drug testing, let alone for Wilborn's test, and so the document provides no admissible evidence of what Kraft "knew or should have known."

Setting aside these evidentiary concerns, the document is not evidence of pretext. During her deposition, Frueh summarized the training she received on hair follicle testing and explained how she applied what she knew to Wilborn's case. Specifically, she explained that: she is not an expert in the field; Kraft typically collects hair samples the length of the tip of a person's pinkie finger; she believes every person's hair grows at different rates; and based on her experience, two weeks was adequate time for a bald person to grow enough hair for a drug test. Dkt. 32 (Frueh Dep. 10:10-12:7; 60:21-62:3). At most, the FAQ challenges whether Frueh's understanding of hair follicle testing is scientifically accurate. But the document is not evidence that Frueh lacked a basis in fact for giving Wilborn two weeks to grow sufficient hair. Quite the opposite; when confronted with the FAQ, Frueh maintained that she acted according to her training and experience in directing Wilborn to submit to a second test.

Wilborn also relies on the FAQ document's statement that hair testing can detect drug use from the last 90 days as evidence that Kraft's continued insistence on a hair follicle test, even beyond 90 days after the January 12 accident, was a pretext for discrimination. The argument might be persuasive except that Frueh testified that, in her experience and according to her training, hair follicle tests could go back as far as six months. *Id.* (Frueh Dep. 10:22-

11:21).[5] Again, the FAQ document is evidence that Frueh might have been wrong; not evidence that she did not honestly believe her position.

Absent evidence of pretext in any of Kraft's decisions, Wilborn cannot proceed under the indirect method, regardless of whether he could make out a prima facie case of discrimination. Kraft is entitled to summary judgment.

## 2.  The direct method

Wilborn's brief in opposition to summary judgment lays out the legal test for proving discrimination under both the direct and indirect methods, and asserts that he can proceed under either. Dkt. 27, at 5-7. Plaintiffs pursuing the direct theory of discrimination must identify "direct or circumstantial evidence that creates a 'convincing mosaic of discrimination' on the basis of race." *Winsley v. Cook Cnty.*, 563 F.3d 598, 604 (7th Cir. 2009) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). Wilborn concedes that he has no direct evidence of discrimination, Dkt. 27, at 5, so the court must analyze whether there is circumstantial evidence of intentional discrimination. There is not.

Evidence that proves a claim under the direct method typically includes:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward, or comments directed at, other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action.

---

[5] Wilborn asserts that Kraft's insistence on a drug test in each of its post-termination offers of reinstatement is also evidence of pretext. Wilborn's second amended complaint alleges that Kraft discriminated against him by: (1) not allowing him to work pending the initial test results; and (2) terminating him for refusing to retake the hair follicle test. Dkt. 15, ¶ 28. To proceed under the indirect method, he must therefore identify evidence of pretext *in those decisions*, not in decisions subsequent to the termination.

*Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 805 (7th Cir. 2014). Wilborn need not offer proof from all three categories as "[e]ach type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case)." *Coleman*, 667 F.3d at 860. But in this case, the evidence does not amount to a mosaic of discrimination for largely the same reasons that the same evidence does not enable Wilborn to make out a prima facie case of discrimination or to show pretext in Kraft's decisions.

Wilborn does not suggest that there is anything suspicious about the timing of this case. He does not direct the court to any statements, comments, or behavior by Kraft employees that would suggest racial animus. His evidence of comparators was too conclusory to establish a prima facie case, and it is just as inadequate in the context of the direct method. Wilborn adduces no evidence, statistical or otherwise, of systematically better treatment for employees outside his own protected class. Thus, any argument Wilborn has to support a convincing mosaic would essentially be one recycled from his failed efforts to show pretext under the indirect method.

The court has already considered and rejected Wilborn's arguments concerning pretext because he simply cannot show that Kraft did not honestly believe the reasons it gave for its actions. But Wilborn identifies one additional piece of evidence. At the January 12 meeting, shortly after Wilborn's accident, Kraft focused on the $500-in-damage provision of the substance abuse policy. Two months later, in answering Wilborn's grievance, Kraft cited *both* the $500 provision and the powered vehicle provision as grounds for requiring the first test. Wilborn asserts that Kraft departed from its practices in "dramatic fashion" by subsequently justifying its request for the first test under the powered vehicle provision of the substance abuse policy. Dkt. 27, at 10. Once again, he relies on conclusory statements in Schwenn's declaration

that this was the first time Kraft had ever defended a test under this section of the substance abuse policy.

The lack of specific evidence is fatal to Wilborn's case under the direct method, just as it was under the indirect method. *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) ("The main problem with [the plaintiff's] 'mosaic' is that there is no solid evidence in the record to support her allegations, as required by Fed. R. Civ. P. 56(e)."). Moreover, even if Wilborn is correct that Kraft supplemented its rationale for requiring the initial test, this is not evidence of pretext. Wilborn cannot genuinely dispute that, given the information Emond had available on January 12, Kraft had legitimate grounds for the initial test under the $500 provision. Wilborn does not explain how Kraft's later addition of another legitimate ground— there is no dispute that the accident involved powered equipment—suggests racial animus in Kraft's decisions.

The sum total of Wilborn's evidence under the direct method is a set of conclusory assertions and Kraft's belated, additional justification for requiring his first drug test. Wilborn falls well short of "constructing a 'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003) (internal citations and quotation marks omitted); *see also Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013) (collecting authority). No single piece of evidence suggests racial animus on Kraft's part, nor could the cumulative weight of Wilborn's evidence, scant as it is, enable a jury to find in his favor. He therefore cannot proceed under the direct method of proof and Kraft is entitled to summary judgment on Wilborn's claim of race discrimination.

**C.  Wilborn's retaliation claim**

In addition to his discrimination claim, Wilborn alleges that Kraft retaliated against him for filing a grievance opposing the drug testing procedures and alleging unequal treatment under the collective bargaining agreement. A retaliation plaintiff can prove his claim using the direct or the indirect method, *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012), but Wilborn is proceeding only under the former. Dkt. 27, at 10. To prove his retaliation claim with the direct method, Wilborn "must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010) (internal citations and quotation marks omitted). Kraft acknowledges that Wilborn satisfies the first two elements; the January 21, 2011, letter from the union's attorneys constituted a protected activity, and Kraft's termination was an adverse employment action.[6] Dkt. 25, at 15. But the company contends that it is nevertheless entitled to summary judgment because Wilborn has no evidence of a causal connection between the two.

As evidence of causation, Wilborn primarily relies on the suspicious timing of his termination, which occurred seven weeks after his union's attorneys wrote a letter to Kraft opposing what they perceived to be discriminatory practices. Dkt. 27, at 11-12. "A claim of retaliation based on suspicious timing depends on what the relevant decision-makers knew and when," *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011), and

---

[6] In his second amended complaint, Wilborn also alleged that "Kraft's continued rejection of the Union's proposals to administer alternative forms of drug testing constitute[s] retaliation for Wilborn's oppositional activities." Dkt. 15, ¶ 32. In moving for summary judgment, Kraft argued that its insistence on a hair follicle test could not constitute an adverse employment action. Dkt. 25, at 15. Wilborn failed to respond to this point in opposing Kraft's motion. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Even had he replied, Wilborn could not proceed with his retaliation claim because he has not presented evidence of a causal connection.

25

obviously "the order of events is even more important than the time between them; the theory doesn't work if the retaliatory act *precedes* the protected activity." *Leonard v. E. Ill. Univ.*, 606 F.3d 428, 432 (7th Cir. 2010) (original emphasis). In other words, Wilborn cannot succeed on his retaliation claim if the decision to terminate him occurred before he opposed Kraft's unlawful practices. And that is exactly what Kraft asserts occurred in this case: on January 19, the company decided and informed Wilborn that he would be terminated if he did not complete a retest within two weeks; two days later, on January 21, the union's attorneys sent a letter to Kraft asserting that pursing a second test would violate federal law.

Confronted with this chronology, Wilborn responds that Kraft (through Frueh) did not actually *decide* to terminate him until shortly before March 14, when Kraft sent Wilborn a termination letter. To support his position, Wilborn relies on the fact that Kraft repeatedly extended the deadline by which Wilborn needed to complete the second test and portions of Frueh's deposition that suggest the final decision to terminate him was not made until closer to March 14. On January 19, Kraft gave Wilborn two weeks to complete his retest and indicated that he would be fired if he did not do so. When the two-week period expired, Kraft wrote a memo to Wilborn's union, extending the deadline for another three days and again warning that he would be fired for refusing to comply. Even after the second deadline expired, Kraft did not formally terminate Wilborn's employment until over a month later. At her deposition, Frueh testified that Kraft did not decide to terminate Wilborn for failing to retest until on or near March 14. Dkt. 32 (Frueh Dep. 55:10-15).

Kraft contends that Wilborn has selectively quoted from Frueh's deposition. The company directs the court to other portions where Frueh clarified that, since January 19, the company had decided that Wilborn would be fired if he failed to retest, and March 14 was simply the date on which it concluded that Wilborn had not completed a retest. *Id.* (Frueh Dep.

26

56:19-57:3). Kraft thus distinguishes the decision to terminate Wilborn if he did not retest from the conclusion that Wilborn had not retested and would therefore be terminated. The company argues that only the former qualifies as a materially adverse employment action for purposes of Wilborn's retaliation claim. Assuming that March 14 was the date of the critical "decision" in this case, Wilborn does not dispute that Kraft articulated its reasons for terminating him before he ever opposed any unlawful practices, or that the company has consistently reasserted those reasons, and only those reasons. Wilborn also does not dispute that the substance abuse policy permitted Kraft to terminate employees who failed to comply with requests for drug testing. Thus, the evidence of suspicious timing in this case ultimately amounts to Kraft announcing its intent to terminate Wilborn—an action it was entitled to take—and then following through on that threat despite Wilborn complaining about race discrimination a few months earlier.

Even drawing reasonable inferences in his favor, Wilborn has not identified evidence of suspicious timing. Kraft's stated reason for terminating Wilborn was that he chose not to submit to a retest, and Kraft began asserting that reason *before* Wilborn ever engaged in protected conduct. Moreover, the Seventh Circuit has held that "suspicious timing alone is almost always insufficient to survive summary judgment." *Leitgen*, 630 F.3d at 675. Wilborn nevertheless asserts that the interval between opposition and termination establishes a causal link because his discharge took place "on the heels" of his protected activity. Dkt. 27, at 12. He directs the court to two cases, *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006), and *Lang v. Illinois Department of Children & Family Services*, 361 F.3d 416, 419 (7th Cir. 2004), which respectively conclude that four months is too long a delay to infer causation, but that a one-month delay is "extremely suspicious." Wilborn urges the court to place his seven-week window closer to *Lang*'s side of this spectrum and conclude that Kraft's timing in this case is likewise "extremely suspicious."

As an initial matter, the Seventh Circuit has already concluded that "[t]he approximate seven-week interval between [a plaintiff's] complaint and her subsequent arrest/termination does not represent that rare case where suspicious timing, without more, will carry the day." *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008). More importantly, Wilborn overlooks language in *Lang* explaining that "[c]lose temporal proximity provides evidence of causation . . . and may permit a plaintiff to survive summary judgment *provided that there is also other evidence that supports the inference of a causal link*." 361 F.3d at 419 (emphasis added) (internal citations omitted). Wilborn's emphasis on timing notwithstanding, it is his lack of "other evidence" that ultimately dooms his retaliation claim.

Wilborn again recycles many of the pretext and convincing mosaic arguments he made in the context of his discrimination claim, and asserts that the same evidence of similarly situated employees, patent falsity in Frueh's determination that he could grow adequate hair within two weeks, and added justification for the first drug test, all support his retaliation claim. Yet, for the same reasons that the evidence was insufficient to save Wilborn's discrimination claim from summary judgment, it is not enough to enable a reasonable jury to conclude that Kraft terminated him because of the January 21 letter in which Wilborn opposed the initial drug test. Without evidence of causation, Wilborn's retaliation claim must fail as a matter of law. Kraft is entitled to summary judgment.

ORDER

IT IS ORDERED that:

1. Defendant Kraft Foods Group, Inc.'s motion for summary judgment, Dkt. 20, is GRANTED.

2.  The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 26th day of November, 2014.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge